UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 17 2004

Michael N. Milby
Clerk of Court

RUBEN DARIO PRADO-RIVERA, )
)
v. )
)
TOM RIDGE, and MARC MOORE, )
U.S. DEPT OF HOMELAND SECURITY, and )
)
THE UNITED STATES OF AMERICA. )
)

B-04-098

POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

EXHIBIT C:

Exhibit C consists of "Respondent's Brief on Appeal" to the BIA.

Respectfully Submitted,

Lisa S. Brodyaga, Attorney
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
(956) 421-3423 (fax)
Fed. ID. 1178
Texas Bar 03052800

CERTIFICATE OF SERVICE

I, Lisa S. Brodyaga, certify that a courtesy copy of the foregoing, with exhibit, was personally delivered to the office of Steven Schammel, AUSA, at Brownsville, Texas, this 17th day of June, 2004.

EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BEFORE THE BOARD OF IMMIGRATION APPEALS

In re

RUBEN DARIO PRADO-RIVERA
A34 586 508

RESPONDENT'S BRIEF ON APPEAL

Comes Respondent herein, by and through the undersigned, and files the instant brief, in support of his appeal from the Oral Decision of the Immigration Judge, finding that he was an "arriving alien," that his conviction in February 2000 for simple possession of less than one ounce of cocaine is an "aggravated felony," and that he is therefore ineligible for any form of relief from removal.

I. THE FACTS

Respondent Ruben Dario Prado, ("Mr. Prado"), is a native and citizen of Mexico. He has been a lawful permanent resident of the U.S., ("LPR"), since June 21, 1974, at which time he was fourteen years old. His wife, Maria Norma Prado has also been an LPR since she was a toddler. The couple has four children, ages 9 to 19. Mr. Prado's parents and siblings are also U.S. citizens or LPRs.

On April 29, 2002, Mr. Prado applied for admission as a returning resident at the port of entry, following a brief, casual, and innocent visit to Mexico, lasting less than 24 hours. At that time, he was detained, and placed under removal proceedings, as an "arriving alien" on the basis of a conviction in February 2000, for (simple) possession of one gram, or less, of cocaine.

At his hearing, Mr. Prado denied that he was an "arriving alien," on the grounds that 8 U.S.C. §1102(a)(13)(C) did not, and could not, overrule *Rosenberg v. Fleuti*, 374 U.S. 449 (1963). The Judge overruled this objection. Because he denied being an arriving alien, he also denied that he was inadmissible, under §1182(a)(2)



(A)(i)(II). In the alternative, Mr. Prado urged that his conviction was not for an aggravated felony, and filed a fee-paid application for cancellation of removal, pursuant to 8 U.S.C. §1229b(a). However, the Immigration Judge pretermitted his application, on the basis of the Judge's conclusion that his offense was an aggravated felony. A timely appeal was filed.

## II. ISSUES PRESENTED

A. NOTWITHSTANDING THE 1996 AMENDMENTS TO §1101(a)(13), RESPONDENT CANNOT CONSTITUTIONALLY BE CHARACTERIZED AS AN "ARRIVING ALIEN," AND THEREFORE CANNOT BE HELD SUBJECT TO THE STRICTURES OF §1182(a).

1. ROSENBERG v. FLEUTI WAS CONSTITUTIONALLY BASED, AND CANNOT BE LEGISLATIVELY OVERRULED, PARTICULARLY WHERE AN ALTERNATE CONSTRUCTION EXISTS WHICH AVOIDS THOSE PROBLEMS

2. ALTERNATIVELY, IT VIOLATES EQUAL PROTECTION TO SUBJECT RESPONDENT TO THE RESTRICTIONS OF §212(a) SIMPLY BECAUSE HE MADE A FLEUTI-TYPE DEPARTURE, WHERE LPRs WHO MADE NO SUCH DEPARTURE ARE NOT SUBJECT TO §212(a).

3. ALTERNATIVELY, RESPONDENT WAS ENTITLED TO TIMELY NOTICE THAT HIS TRAVEL RIGHTS HAD BEEN CURTAILED, BEYOND THAT PROVIDED BY THE AMENDMENT TO 8 U.S.C. §1101(a)(13).

II. MR. PRADO'S CONVICTION CANNOT CONSTITUTIONALLY BE CHARACTERIZED AS AN "AGGRAVATED FELONY" FOR PURPOSES OF THE IMMIGRATION LAWS.

## III. ARGUMENT

Whether a state felony conviction for possession of a small amount of a controlled substance is an "aggravated felony" for purposes of seeking relief from removal is still open to debate, particularly where the conviction occurred prior to the issuance of *U.S. v. Hernandez-Avalos*, 251 F.3d 505 (5th Cir. 2001). Respondent's Exhibit A, incorporated by reference. Likewise, whether an LPR can be held as an "arriving alien" under circumstances which would qualify as a *Fleuti*-type departure is not resolved. Respondent's Exhibit B, incorporated by reference. The case at bar presents both issues.

2

**A. NOTWITHSTANDING THE 1996 AMENDMENTS TO §1101(a)(13), RESPONDENT CANNOT CONSTITUTIONALLY BE CHARACTERIZED AS AN "ARRIVING ALIEN," AND IS NOT INADMISSIBLE, PURSUANT TO THE STRICTURES OF §1182(a).**

Mr. Prado first disputes that he can constitutionally be classified as an arriving alien for purposes of these proceedings. He also asserts that, where, as here, an alternate construction exists which avoids those problems, the Board is bound to accept such a construction. *Webster v. Reproductive Health Services*, 492 U.S. 490, 562 (1989) (where "fairly possible," a statute must be construed so as to avoid serious constitutional difficulties). And, since he disputes that he is an arriving alien, he claims that he is not and cannot be inadmissible, since he is a returning LPR.

**1. ROSENBERG v. FLEUTI WAS CONSTITUTIONALLY BASED, AND CANNOT BE LEGISLATIVELY OVERRULED.**

Prior to the enactment of (former) 8 U.S.C. §1101(a)(13), the courts had been faced with a number of cases where, for various reasons, the courts had concluded that LPRs who had departed from the U.S. were not making "entries" on their return. In *Rosenberg v. Fleuti*, 374 U.S. 449, 455-56 (1963), the Supreme Court summarized some of these cases, including *Delgadillo v. Carmichael*, 332 U.S. 388 (1947), in order to discern Congressional intent in enacting §1101(a)(13) (original footnotes omitted) (current footnote added):

> Later the same year this Court, because of a conflict between Di Pasquale [1] and Del Guercio v. Delgadillo, 159 F.2d 130 (C.A.9th Cir. 1947), granted certiorari in the latter case and reversed a deportation order affecting an alien who, upon rescue after his intercoastal merchant ship was torpedoed in the Caribbean during World War II, had been taken to Cuba to recuperate for a week before returning to this country. Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17. The Court pointed out that it was 'the exigencies of war, not his voluntary act,' id., at 391, 68 S.Ct. at 12, which put the alien on foreign soil, adding that '(w)e might as well hold that

---

[1] *DiPasquale v. Karnuth*, 158 F.2d 878 (2nd Cir. 1947).

3

if he had been kidnapped and taken to Cuba, he made a statutory 'entry' on his voluntary return. Respect for law does not thrive on captious interpretations.' Ibid. Since '(t)he stakes are indeed high and momentous for the alien who has acquired his residence here,' ibid., the Court held that

> '(w)e will not attribute to Congress a purpose to make his right to remain here dependent on circumstances so fortuitous and capricious as those upon which the Immigration Service has here seized. The hazards to which we are now asked to subject the alien are too irrational to square with the statutory scheme.' Ibid.

The increased protection of returning resident aliens which was brought about by the Delgadillo decision, both in its result and in its express approval of Di Pasquale, was reflected in at least two subsequent lower-court decisions prior to the enactment of s 101(a)(13). In Yukio Chai v. Bonham, 165 F.2d 207 (C.A.9th Cir. 1947), the court held that no 'entry' had occurred after a ship carrying a resident alien back from seasonal cannery work in Alaska made an unscheduled stop in Vancouver, B.C., and in Carmichael v. Delaney, 170 F.2d 239 (C.A.9th Cir. 1948), the court held that a resident alien returning from wartime service with the United States Maritime Service during which he had stopped at many foreign ports made no 'entry' because all of the movements of the ship to which he had been assigned were pursuant to Navy orders.

It was in light of all of these developments in the case law that § 101(a)(13) was included in the immigration laws with the 1952 revision. As the House and Senate Committee Reports, the relevant material from which is quoted in the margin, make clear, the major congressional concern in codifying the definition of 'entry' was with 'the status of an alien who has previously entered the United States and resided therein * * *.' This concern was in the direction of ameliorating the harsh results visited upon resident aliens by the rule of United States ex rel. Volpe v. Smith, supra, as is indicated by the recognition that 'the courts have departed from the rigidity of (the earlier) rule,' and the statement that '(t)he bill (gives) due recognition to the judicial precedents.'

4

From this, it is clear that, much as occurred with *INS v. St. Cyr,* 121 S.Ct. 2271 (2001), while *Fleuti* was ostensibly decided on the basis of statutory construction, the exception which the Court read into the statute was mandated by the need to avoid serious Constitutional problems. And although Congress may repeal or amend the statute, it may not repeal or amend those Constitutional roots. *See also, Dickerson v. U.S.,* 120 S.Ct. 2326 (2000) ("Miranda rule" is constitutionally based, and may not be overruled by Congress).

Moreover, at least one District Court, in *Made v. Ashcroft,* 01-CIV -1039 (D.N.J. 2001) [2] has agreed that a viable construction exists which avoids these difficulties, and even concluded that it was:

> ... evident from the plain language of 8 U.S.C. §1101(a)(13)(C)(v) and the principle underlying the <u>Fleuti</u> decision that the <u>Fleuti</u> decision has survived the enactment of the 1996 INA amendments.

In *Made,* the Government opted to give the immigrant the benefit of the District Court ruling, rather than risk an appeal. Perhaps for this reason, a striking paucity of reported cases: to wit, one address the issue, and it cannot be characterized as "good law." [3]

That the constitutional roots of *Fleuti* implicate the same type of concerns as in *St. Cyr, Zadvydas,* and *Dickerson* is seen from the manner in which it has been treated, including the reference by the dissent in *Demore v. Kim,* 123 S.Ct. 1708 (2003), quoting *Landon v. Plasencia,* 459 U.S. 21, 33 (1982). 123 S.Ct. at *65, n.7:

> n7 "Although the holding [in *Kwong Hai Chew*] was one of

---

[2] Respondent's Exhibit A.

[3] *Richardson v. Reno,* 162 F.3d 1338, 1348 (11th Cir. 1998), vacated and remanded on other grounds, *Richardson v. Reno,* 526 U.S. 1142 (1999), reaffirmed in part, on other grounds, *Richardson v. Reno,* 180 F.3d 1311 (11th Cir. 1999), and then overruled by *St. Cyr,* and *Bejacmar v. Ashcroft,* 291 F.3d 735, 736 (11th Cir. 2002).

5

> regulatory interpretation, the rationale was one of constitutional law. Any doubts that *Chew* recognized constitutional rights in the resident alien returning from a brief trip abroad were dispelled by *Rosenberg v. Fleuti*, 374 U.S. 449, 10 L. Ed. 2d 1000, 83 S. Ct. 1804 (1963),] where we described *Chew* as holding 'that the returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him.' 374 U.S., at 460."

*See also Al Najjar v. Ashcroft*, 257 F.3d 1262,1298 (11th Cir. 2001):

> Turning now to the "continuous physical presence" requirement on which the BIA affirmed the denial of Mazen's suspension application, we inquire into whether this was also a "discretionary decision" within the meaning of §§ 309(c)(4)(E). In *Kalaw v. INS*, 133 F.3d 1147, 1151 (9th Cir. 1997), the Ninth Circuit examined this question, reasoning that:
>
>> Continuous physical presence[] must be determined from the facts, not through an exercise of discretion. Either the petitioner has been continuously present in the United States for seven years or the petitioner has not. There are legal standards guiding this inquiry, *see, e.g., Rosenberg v. Fleuti*, 374 U.S. 449, 462, 83 S. Ct. 1804, 1812, 10 L. Ed. 2d 1000 (1963) (brief, casual, and innocent departures from the United States do not break a period of continuous physical presence), and we have reversed the BIA's determination when it applied the wrong standard, *see, e.g., Castrejon-Garcia v. INS*, 60 F.3d 1359 (9th Cir.1995); *Kamheangpatiyooth v. INS*, 597 F.2d 1253 (9th Cir.1979). ...

As the Court reasoned in *Made v. Ashcroft, supra,* §1101(a)(13)(C) is formulated in the negative. Previously, §1101(a)(C)(13) stated that an LPR was to be considered an "arriving alien" **unless** certain factors existed. Now, it states that he or she shall **not** be considered to be an "arriving alien" unless certain (other) factors exist. However, it nowhere states that if, those factors exist, she **must** be treated as an "arriving alien." This leaves open the

6

door to a finding that, if the conditions of *Fleuti* are fulfilled, the LPR is not to be treated as an "arriving alien" notwithstanding the presence of one of the enumerated factors of §1101(a)(C)(13).

Even assuming, *arguendo*, that reasonable minds may differ with the conclusion in *Made* that the "plain language" of §1101(a)(13)(C) demonstrates that *Fleuti* has **not** been legislatively overruled, it is submitted that, given the constitutional roots of *Fleuti*, this conclusion is mandated by cases such as *Webster, supra*. Clearly, *Fleuti* has sufficient constitutional grounding to warrant a search for an interpretation which avoids such problems. And even more clearly, the construction adopted by the District Court in *Made* flows more naturally from the statutory language than the insertion of the phrase "reasonable period of time" into the detention statute under consideration in *Zadvydas*.

**2. ALTERNATIVELY, IT VIOLATES EQUAL PROTECTION TO SUBJECT RESPONDENT TO THE RESTRICTIONS OF §212(a) SIMPLY BECAUSE HE MADE A FLEUTI-TYPE DEPARTURE, WHERE LPRs WHO MADE NO SUCH DEPARTURE ARE NOT SUBJECT TO §212(a).**

Independently of *Fleuti*, it is urged that, as applied herein, 8 U.S.C. §1101(a)(13)(C)(v) violates Equal Protection, for the same reasons that it has been universally accepted that former §212(c) violated Equal Protection. *See, Francis v. INS*, 532 F.2d 268 (2nd Cir. 1976); *Matter of Silva*, 16 I&N Dec. 26 (BIA 1976). As noted in *Requena-Rodriguez v. Pasquarell*, 190 F.3d 299,308-9 (5th Cir. 1999) (amended on other grounds by *St. Cyr, supra*) (emphasis added):

> Requena's claim is inspired by the history of § 212(c). Before IIRIRA, the INA always distinguished between exclusion proceedings, which were brought against aliens attempting to enter the United States (including those returning to the United States), and deportation proceedings, which were brought against aliens already present in the United States. (IIRIRA's permanent provisions have collapsed both kinds of proceedings into a single category of "removal.") Although the original §

7

> 212(c) literally applied only in exclusion proceedings, the INS began allowing § 212(c) applications in deportation proceedings for aliens who had previously left the United States and returned, apparently under the notion that such deportation proceedings were like delayed exclusion proceedings. But the INS still did not allow § 212(c) applications in deportation proceedings against aliens who had never left the United States. **In a decision subsequently embraced by the BIA, the Second Circuit held that there was no rational basis for this distinction between deportable aliens who had never left the United States and those who had left and returned to the United States.** See Francis v. INS, 532 F.2d 268 (2d Cir.1976); see also Hussein v. INS, 61 F.3d 377, 379 & n. 3 (5th Cir.1995) (describing history).

See also, Plyler v. Doe, 102 S.Ct. 2382 (1982) (even aliens unlawfully present in the country are entitled to Equal Protection); Reno v. Flores, 113 S.Ct. 1439, 1449 (1993) (examining immigration statute for Equal Protection violation, and finding none); Ghassan v. INS, 972 F.2d 631 (5th Cir. 1992), (extending §212(c) to deportation proceedings on Equal Protection grounds).

**3. ALTERNATIVELY, RESPONDENT WAS ENTITLED TO TIMELY NOTICE THAT HIS TRAVEL RIGHTS HAD BEEN CURTAILED, BEYOND THAT PROVIDED BY THE AMENDMENT TO 8 U.S.C. §1101(a)(13).**

In the further alternative, Mr. Prado urges that he was entitled to some form of notice, beyond that provided by the amendment to 8 U.S.C. §1101(a)(13), before he could be held to its terms. See, generally, Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (notice contained in municipal utility's bills, stating that payment was overdue and that service would be discontinued if payment was not made by certain date, was not reasonably calculated to inform customers of availability of procedure for protesting proposed termination of utility service as unjustified, and thus deprived customers of notice to which they were entitled under the due process clause; and due process required that municipal utility provide its customers with some

8

administrative procedure for entertaining customer complaints prior to termination of services, in order to afford reasonable assurance against erroneous or arbitrary withholding of essential services).

## II. RESPONDENT'S CONVICTION IS NOT AN "AGGRAVATED FELONY" FOR PURPOSES OF THE IMMIGRATION LAWS.

Finally, and most importantly, Mr. Prado urges that his conviction cannot constitutionally be construed as an aggravated felony for immigration purposes because it contains no element of trafficking. This claim is supported both as a matter of statutory construction, based in part on the amendments of November 1, 2001, to the United States Sentencing Guidelines, and as a matter of constitutional law. Although this argument was recently rejected by the Fifth Circuit in *U.S. v. Caicedo*, 312 F.3d 697 (5th Cir. 2002), said case recognized the very principle it denounced in *Hernandez-Avalos*, supra, which expressed, in *dicta*, strong opposition to *Matter of K-V-D-*, 22 I&N Dec. 1163 (BIA 1999), which held that the same phrase could have different meanings in different contexts. As stated in *Caicedo*, at 708-09 (emphasis added):

> Contrary to *Sanchez* [4] and *Ramirez*, [5] we conclude that the definition of "drug trafficking crime" found in § 2L1.2 does not supercede that in 8 U.S.C. § 1101(a)(43) for purposes of the aggravated felony enhancement. Although rendering the guideline less clear than is desirable, § **2L1.2's implication of two distinct definitions of drug trafficking crimes is neither repugnant to principles of statutory construction nor inconsistent with the Sentencing Commission's prior practice.**

Once again, one must return to the fact that in *Caicedo*, as in *Hernandez-Avalos*, The Court was addressing the Sentencing

---

[4] *United States v. Sanchez*, 179 F.Supp.2d 689 (W.D.Tx 2001)

[5] *United States v. Ramirez*, 2002 U.S. Dist. LEXIS 16871, No. 01-CR-888(DAB), 2002 WL 31016657 (S.D.N.Y. Sept. 9, 2002)

9

Guidelines, as applied in the context of unlawful re-entry following deportation. Virtually by definition, therefore, the issue was not whether a long-term lawful permanent resident would be mandatorily stripped of his status, and deported, never to be lawfully reunited with his family, but the length of a criminal sentence to be served by an individual who had been previously deported, and had returned unlawfully. Presumably, the issues of whether the underlying offense was sufficient to warrant deportation should, and could, have been addressed prior to his deportation. And similarly, none of the constitutional issues presented herein would or could have been raised in that context.

The definition of "aggravated felony" applicable herein is 8 U.S.C. §1101(a)(43)(B), to wit, (emphasis added):

> (B) **illicit trafficking in a controlled substance** (as defined in section 102 of the Controlled Substances Act [21 U.S.C. §802]), including a drug trafficking crime (as defined in section 924(c) of title 18, United States Code).

Note that the phrase defined is "illicit trafficking in a controlled substance." The assertion that a simple possession offense can be a drug "trafficking" crime is not only counterintuitive, but is contradicted by previous BIA precedent. Indeed, the BIA once observed that "[t]he offense of simple possession would appear to be one example of a drug-related offense not amounting to the common definition of 'illicit trafficking.'" *Matter of Davis*, 20 I&N Dec. 536,541 (BIA 1990). [6]

---

[6] Characterizing such an offense as a "drug trafficking offense" is reminiscent of an anecdote attributed to Abraham Lincoln. Lincoln asked a young lawyer, "How many legs does a cow have, if we call the tail a leg?" The young lawyer replied that, under those conditions, the cow would have five legs. "Four," disagreed Lincoln. "Calling a tail a leg doesn't make it one." With apologies to President Lincoln, calling simple possession a "drug trafficking crime" doesn't make it one.

10

Clearly, the plain language, as well as the obvious intent, of §1101(a)(43)(B) was to cover offenses containing an element related to **trafficking** in drugs, not simple possession.[7] In *Matter of L-G-*, 21 I&N Dec. 89 (BIA 1995), and again in *K-V-D-*, *supra*, the BIA gave effect to the plain meaning and furthered the goal of national uniformity of the immigration laws, by construing §1101(a)(43)(B) as limited to offenses which would be felonies under federal law. Until the issuance of *Hernandez-Avalos,* this had the effect of excluding simple possession offenses of all controlled substances except crack cocaine, the possession of any amount of which is a felony under federal law, from the definition of aggravated felony.

The essential premise of the pertinent *dicta* in *Hernandez-Avalos* is that an offense which is considered to be an "aggravated felony" for the purposes of the Sentencing Guidelines should also be an "aggravated felony" for immigration purposes. If so, the converse should also hold. 18 U.S.C. §924(c) relates to the possession and use of firearms during the commission of "drug trafficking" offenses, and crimes of violence. In that context, it may make sense to include simple possession of drugs, since someone who, for example, brandishes a weapon at a police officer who is trying to arrest him or her for "simple possession" should be treated in a like manner as someone who did the same during the sale of a small quantity of drugs to an undercover agent. However, the Sentencing Commission exercised a degree of "Lincolnian" common sense with respect to the importation of this definition into the immigration context, and specifically excluded "simple possession" offenses, (which offenses, virtually by definition, are *not* committed with the aid of a firearm), from the definition of "drug trafficking" crimes for purposes of 8 U.S.C. §1326.

---

[7] *See, Gerbier v. Holmes,* 280 F.3d 297 (3rd Cir. 2002).

11

As Judge Justice reasoned in *U.S. v. Sanchez, supra*, continuing to call such offenses "aggravated felonies," because of the literal wording of §101(a)(43), would result in an "absurd" and therefore, untenable, result; 179 F.Supp.2d at 691:

> Such a result may seem rational under a strict, methodical interpretation of the guidelines. But this analysis reveals an inherent inconsistency. It is a accepted rule of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." *C.I.R. v. Keystone Consol. Industries, Inc.*, 508 U.S. 152, 113 S.Ct. 2006, 2011, 124 L.Ed.2d 71 (1993). This principle should apply even more strongly when identical terms are incorporated by reference into a single subsection of a sentencing guideline.
>
> The new guidelines explicitly define "drug trafficking offense" to *exclude* convictions for simple possession, felonies or not. See U.S.S.G. § 2L1.2, comment. (n.1(B)(iii)). However, the new guidelines' definition of "aggravated felony" incorporates a definition of "drug trafficking offense" that *includes* felony convictions for simple possession. If the government's reasoning were adopted, then "drug trafficking offense" would mean one thing for the 12-level enhancement and another thing entirely for the 8-level enhancement. Put more starkly, to properly sentence a defendant such as this one for illegal re-entry, a court would have to find that the defendant's prior conviction both *is and is not* a drug trafficking offense. It borders on the irrational to assume that the Sentencing Commission--much less Congress--would intend such an outcome. *See Rowland v. California Men's Colony*, 506 U.S. 194, 113 S.Ct. 716, 720 & n. 3, 121 L.Ed.2d 656 (1993) (citing the "common mandate of statutory construction to avoid absurd results").

Consequently, Mr. Prado urges that the new definition must be applied equally in the immigration, and Sentencing Guidelines, contexts. The injustice of a contrary interpretation is apparent in cases such as the one at bar, where an LPR accepted a plea bargain at a time when this disposition did not bar his eligibility

12

for cancellation of removal. This is particularly true in Texas, where simple possession of any "visible and measurable" amount of cocaine, no matter how trivial, is a felony. Texas Health & Safety Code §§481.102(3)(D) and 481.115(d). *See also, Kemp v. State*, 861 SW2d 44 (App. 14 Dist. 1993) ("specks" of white powder in baggie, weighing .5 milligrams, sufficient to sustain a conviction).

If Sentencing Guidelines cases such as *Caicedo*, and the *dicta* in *Hernandez-Avalos* are given effect in the immigration context, LPRs such as Mr. Prado would be considered to be ineligible for any form of relief from deportation, no matter their equities, because their offenses are "aggravated felonies." This would raise serious constitutional issues, under the Equal Protection clause;[8] and as a violation of Mr. Prado's right to Substantive Due Process.[9] The

---

[8] In the Ninth Circuit, deferred adjudication is not considered to be a conviction, and such persons would not even be subject to removal. *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000). In both the Second and Third Circuits, a conviction for simple possession of a controlled substance is not considered to be an aggravated felony. *See, Aguirre v. INS*, 79 F.3d 315 (2d Cir. 1996); *U.S. v. Pornes-Garcia*, 171 F.3d 142 (2nd Cir. 1999), and *Gerbier v. Holmes*, 280 F.3d 297 (3rd Cir. 2002).

[9] *See, e.g., Zadvydas v. Davis*, 121 S.Ct. 2491 (2001), and cases such as *Hoang v. Comfort*, 282 F.3d 1247 (10th Cir. 2002); *Kim v. Ziglar*, 276 F.3d 523 (9th Cir. 2002), and *Patel v. Zemski*, 275 F.3d 299 (3rd Cir. 2001), applying retroactivity and Substantive Due Process principles in other contexts relating to immigrants. *See,* Dissenting Opinion of Board Member Rosenberg, *Matter of Salazar-Regino*, 23 I&N Dec. 223,238 (BIA 2002). *See also, Landon v. Plasencia*, 459 U.S. 21,34 (1982), citing *Bridges v. Wixon*, 326 U.S. 326 U.S. 135,154 (1945); *Moore v. City of East Cleveland*, 431 U.S. 494,499 (1977), and *Stanley v. Illinois*, 405 U.S. 645, 651 (1972):

> Plasencia's interest here is, without question, a weighty one. She stands to lose the right "to stay and live and work in this land of freedom," ... Further, she may lose the right to rejoin her immediate family, a right that

13



definition of "aggravated felony" as found in 8 U.S.C. §1101(a)(43)(B), together with the bar against relief for any LPR convicted of an "aggravated felony" in 8 U.S.C. §1229b(a), result in an overbroad statutory scheme which interferes with protected family interests by means of a "conclusive presumption" that no non-citizen convicted of an offense within the scope of §1101(a)(43)(B), regardless of his family ties, and the minimal nature of his offense, is worthy of remaining in the U.S..

Perhaps most importantly, such an interpretation would deprive Mr. Prado of Procedural Due Process, as seen by Supreme Court cases involving "fair notice." Although not "punishment," deportation has long been recognized as a "penalty." *See, Reno v. American-Arab Anti Discrimination Committee*, 525 U.S. 471, 497-98 (1999), Justice Ginsberg, concurring in Part I and the result:

> As this Court has long recognized, "[t]hat deportation is a penalty - at times a most serious one - cannot be doubted." *Bridges*, 326 U.S., at 154, 65 S.Ct. 1443; see also ibid. (Deportation places "the liberty of an individual ... at stake.... Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom.")

Deportation then becomes an additional penalty, retroactively attached to the "criminal offense," solely by virtue of changed

---

ranks high among the interests of the individual. ...

*Moore* and *Stanley* are fundamental rights cases, involving family relationships. *Stanley* struck down a conclusive presumption, similar to that involved herein, and *Moore* simply concluded that the interest advanced by the State was insufficient to justify the particular intrusion into the family unit. As an LPR, Mr. Lucio enjoys the same substantive Due Process rights, to develop and enjoy intimate family relationships in the United States.

14

administrative and judicial interpretations thereof.[10] Therefore, §1101(a)(48)(B), as interpreted and applied herein, is unconstitutional in that it retroactively makes qualitative changes in the penalty imposed, in a wholly unexpected manner. *See,* Nancy Morawetz, "Rethinking Retroactive Deportation Laws and the Due Process Clause," NYU Law Rev., Vol 73, No. 1, April 1998. *See also, Arce v. Walker,* 139 F.3d 329,333-34 (2nd Cir. 1998):

> [T]he Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300; *see id.* at 479 n. 4, 115 S.Ct. at 2297 n. 4 (observing that proscribed conditions of confinement must be "qualitatively different from the punishment characteristically suffered by a person convicted of crime, and [have] stigmatizing consequences." (citation and internal quotation marks omitted)); *see, e.g., Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) (holding that "involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual"); *Washington v. Harper,* 494 U.S. 210, 221-22, 110 S.Ct. 1028, 1036-37, 108 L.Ed.2d 178 (1990) (holding that inmate has a liberty interest under the Due Process Clause to refuse the involuntary administration of psychotropic drugs).

These protections exist even though deportation is a civil penalty, not criminal punishment. As the Supreme Court held in *BMW of North America v. Gore,* 517 U.S. 559,574 (1996) (footnote 22 in original):

> Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose. FN22

---

[10] This is very similar to, and is reinforced by, the "void for vagueness" analysis of *Jordan v. DeGeorge,* 341 U.S. 223,231 (1951) (statute relating to deportation would be tested under "void for vagueness" doctrine, notwithstanding that statute was not criminal statute, in view of grave nature of deportation).

15

> FN22. See *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (*Ex Post Facto* Clause violated by retroactive imposition of revised sentencing guidelines that provided longer sentence for defendant's crime); *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (retroactive application of new construction of statute violated due process); *id.*, at 350-355, 84 S.Ct., at 1701-1703 (citing cases); *Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (due process violated because defendant and his counsel did not have adequate notice that judge might impose death sentence). The strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases, but the basic protection against "judgments without notice" afforded by the Due Process Clause, *Shaffer v. Heitner*, 433 U.S. 186, 217, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (STEVENS, J., concurring in judgment), is implicated by civil *penalties*.

For a lawful permanent resident such as Mr. Prado, there can be no question but that mandatory removal is a "civil penalt[y]" imposed as a result of his criminal "conviction" for possession of cocaine. It therefore violates Due Process as a retroactive application of new construction of a statute, as in *Bouie v. City of Columbia, supra*, and because it imposes a "civil penalt[y]" without prior notice, as in *Shaffer v. Heitner, supra*. And, as in *BNW of North America v. Gore, supra*, it confounds the "[e]lementary notions of fairness enshrined in this Court's constitutional jurisprudence" which "dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose."

Furthermore, such a construction would also deprive him of Equal Protection, as his offense would **not** be considered an "aggravated felony" in either the Second, or Third, Circuits. [11]

---

[11] *U.S. v. Pornes-Garcia, supra*; *Gerbier v. INS, supra*.

16

As reiterated in *INS v. St. Cyr, supra*, and *Zadvydas v. Davis*, 121 S.Ct. 2492 (2001), such serious constitutional doubts mitigate in favor of finding a statutory interpretation which would avoid the constitutional concerns, even if one is required to "stretch" the statutory language in order to do so. Here, however, such a statutory interpretation is clear, as is the means of distinguishing *Hernandez-Avalos*, and *Caicedo, supra*. As held by the BIA as early as 1992, [12] and as more recently demonstrated by the amendments to U.S.S.G. §2L1.2(b)(1)(C,D), comment. (n.2), simple possession of a controlled substance is **not** a drug trafficking crime, either for purposes of 18 U.S.C. §924(c), or therefore, under 8 U.S.C. §1101(a)(43)(B).

Respectfully Submitted,

Lisa S. Brodyaga, Attorney
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, and accompanying Exhibits, were personally served on the INS General Attorney at Harlingen, Texas, on May 19, 2003.

---

[12] *Matter of Davis*, 20 I. & N. Dec. 536 (BIA 1992).

17